Green, J.
delivered the opinion of the court.
John King, the ancestor of the complainants, made his will in 1798, and shortly thereafter died. In the first clause of the will is the following bequest, viz: “I do leave and bequeath to my beloved wife, Mary King, horses, cows, sheep and hogs, with the household furniture,to be wholly and solely at her disposal; and likewise Sam, Nan and Cuff, for to be at her disposal for the use and purpose of working, and raising the children, or so long as she continues a widow, or until the children comes of age, then Nan to be hers during her natural life: then they tobe equally divided among my children.’'
The testator then proceeds to make several specific legacies of negroes in case Nan should have children, so as that each of testator’s children should have a young negro, and “the rest to be divided as before.” Nan had a number of children, sufficient for all the specific legacies and also was mother of a girl, Amy, the subject of this suit.
Mrs. King intermarried with Abel Morgan, who died leaving her a widow. The girl, Amy, was retained in her possession until about the year 1832, being then the mother of two children, Philip and Betsey. In 1832, Mrs. Morgan sold the negro, Amy, and her two children, to the defendant Sharp, for six hundred dollars. Before Sharp made the purchase, he was informed by the complainant Gallion, that Mrs. Morgan had only a life estate in the negroes. He enquired of Robert King, the name of the testator of the will by which the said negroes had been bequeathed, and where the will was recorded; after which, he started up the country, and on his return, purchased the negroes. After Sharp purchased the negroes, Amy had another child, Nancy.
In 1836, Sharp sold Amy and her three children to a negro trader who took the negroes out of the country; but where they were taken, or what was the name of the purchaser, the respondent states he does not know. Mrs. Morgan died in 1840.
*57 The defendant, in the first place, insists, that by the will of John King, an unlimited power of disposition of all his personal property is given to his wife, with which the subsequent bequest of a remainder to his children is inconsistent, and therefore, Mrs. King took an absolute estate in the negroes in controversy.
The clause of the will above quoted is somewhat awkwardly expressed, but there is no difficulty in understanding its meaning. As to the stock, and furniture an unlimited power of disposition is conferred; but in the bequest of the negroes, the language is entirely different, limiting the power of disposal, to the use and purpose “of working and raising the children;” then in express words, giving the widow a life-estate in Nan; then to be equally divided among the children-By the word “likewise,” the testator does not mean, that a like disposition is made of the negroes, to that which has been made of the horses, cows, sheep and hogs; but having devised the stock and furniture to his wife, he now “likewise” devises to her the negroes. But he stipulates that the former are vested absolutely in her, whereas, the latter are only to be “used for the- purpose of working and raising the children.”
2d. It is next insisted that if Mrs. King had only a life-estate, she might lawfully sell, and the defendant might buy that estate; and that if she assumed to sell the entire estate, her interest in them alone passed by the conveyance, and therefore she did the remainder-men no wrong.
It is certainly true, that a tenant for life of an estate may dispose of it at pleasure, so that he does not thereby injure the inheritance in remainder. But every owner of a life-estate, either in land or slaves, is quasi trustee for the remainder-men. The estate is committed to his hands, to be used for his benefit during life — but so to be used as that the property shall not be destroyed, and the remainder defeated. If, therefore, the tenant for life, in selling nothing but his. life-estate, shall wilfully make such disposition as he knows will defeat the remainder, he is guilty of a fraudulent breach of trust; much more is he so guilty, if he assumes to dispose of the entire interest. If a party may, fraudulently, combine with the owner of a life-estate in slaves, to defeat the *58 remainder, by affecting to purchase the entire estate, and remove the slaves to parts unknown, so that they cannot be found, or identified, without incurring any liability to the remainder-man, it is easy to see that estates of this description will be of little value. The temptation to commit frauds of this kind would be often seized with avidity by the owner of the life-estate, and the purchase r might easily put the negroes beyond the reach of the remainder-man, by their removal and sale. In this case, the defendant Sharp was informed that Mrs. Morgan owned only a life-estate in the negroes; he made enquiry of Robert King about the will, and then, with full knowledge, or such information as put him on enquiry, and enabled him to obtain a knowledge of all the facts — he made the purchase. By this purchase he acquired a right to the negroes for the life of Mrs. Morgan, and he was bound to hold them subject to the rights of those in remainder. But instead of doing this, he has placed them out of the reach of complainants, with a view to defeat their rights. He had no right to remove them beyond the State. And if the complainants failed to anticipate his removal of the negroes, by a bill, to impound them, or to compel him to give security for the forthcoming of them at the termination of the life-estate, such removal did not thereby become less a wrong on his part. It is his duty to have the slaves forthcoming, and to deliver them up to those in remainder; and if he fails to do so, he must make compensation for them, by the payment of their value. Whether he withholds the delivery of them of choice, or is prevented from doing so, by his own previous fraudulent sale and removal of them, can make no difference. In either case, the remainder-men are entitled to their delivery, or compensation.